## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Dustin Brock Metcalfe,

Civ. No. 13-1692 (RHK/JJG)

Plaintiff,     **MEMORANDUM OPINION**

v.                       **AND ORDER**

Ryan Priebe, *et al.*,

Defendants.

Brandon T. McDonough, Nicholas R. Nowicki, McDonough & Nowicki PLLC, Minneapolis, Minnesota, Chad R. Reichwald, Reichwald Law Firm PLLC, Minneapolis, Minnesota, for Plaintiff

Jon K. Iverson, Susan M. Tindal, Stephanie A. Angolkar, Iverson Reuvers Condon, Bloomington, Minnestoa, for Defendants Ryan Priebe and City of Saint Cloud

Cheri M. Sisk, City of Saint Paul Attorney's Office, Saint Paul, Minnesota, for Defendants Zane Koeger and City of Saint Paul

Kent D. Marshall, Marshall Law Office, Barrett, Minnesota, Stephen F. Rufer, Pemberton Sorlie Rufer & Kershner, Fergus Falls, Minnesota, for Defendant Genevie White

### INTRODUCTION

In this action, Dustin Brock Metcalfe ("Metcalfe") alleges that Ryan Priebe

("Priebe"), Zane Koeger ("Koeger"), and Genevie White ("White") violated his rights

under the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. §§ 2721-2725, by

accessing his driver's license information from the Minnesota Driver and Vehicle

Services ("DVS") database for an impermissible purpose.  He further alleges that the

cities of Saint Cloud ("Saint Cloud") and Saint Paul ("Saint Paul") are vicariously liable

for the acts of their employees Priebe and Koeger, respectively.  All Defendants now

move for summary judgment, while Metcalfe cross-moves for summary judgment against

White, Koeger, and Saint Paul.  For the following reasons, Defendants' Motions will be

granted and Metcalfe's Motions will be denied.

## BACKGROUND

Metcalfe lives in Saint Paul, Minnesota.  (Compl. ¶ 4.)  In 2009, he had a son with

"Jane Doe."[1]  (Id. ¶¶ 32-33.)  Their relationship ended in April 2010, and they

subsequently had a contentious custody fight and numerous related contacts with the

legal system.  The Defendants' accesses of Metcalfe's personal information from the

DVS database were related to or happened around the time of these events.

Beginning in early 2010, and continuing through 2011, White—who is Doe's

mother and a deputy court administrator in Grant County, Minnesota—accessed

Metcalfe's personal information from the DVS database five times.  (Nowicki Decl., Ex.

1, at 17; White Dep. 12.)  She knew her daughter felt threatened by Metcalfe.  (White

Dep. 17.)  She did not explain her motive for each instance she accessed his personal

information, but she testified that, generally, she accessed it because

> "there was upcoming litigation going to be happening, grave concerns.  At
> one point, some of the dates, there was a domestic abuse no-contact order
> out there in a criminal file, a harassment restraining order.  [I was v]ery,
> very concerned for our safety and wanted to be very aware, if he was close,
> to enforce that order, to get help immediately for our safety, my family's
> safety.  I was advised that we were possibly in much danger by several
> people, including attorneys, employers at other places."

(Id. 23.)  She further explained she accessed the information for "the upcoming litigation,

orders, court orders that were in effect, very serious criminal, domestic abuse no-contact

---

[1] Doe remains anonymous to protect her privacy.

orders, harassment restraining orders.  Very serious matters that I needed to be able to enforce for my safety and my family's safety."  (Id. 24.)  She testified that "[t]he purpose was in connection with the civil and criminal proceedings in State court, including but not limited to the enforcement of the Court's Orders."  (Nowicki Decl., Ex. 1, at 15.)  White never talked to anyone about the information she obtained from Metcalfe's DVS records.  (White Dep. 25.)

Shortly after White began looking up Metcalfe's personal information, Priebe, a Saint Cloud police officer, responded to two calls from Doe about Metcalfe.  (Priebe Dep. 32-33.)  About a month later, on July 2, 2010, he was present when Metcalfe was arrested for (and later convicted of) stalking and harassing Doe.  (Priebe Aff. ¶ 5).[2] Around this time, Priebe talked to a police officer from Saint Paul about Metcalfe but could not recollect who it was.  (Priebe Dep. 7-8.)

On July 1, 2010, the day before Metcalfe was arrested in Saint Cloud, Koeger, a Saint Paul police officer, pulled him over for speeding.  (Koeger Aff., Ex. B, at 3.)  During the stop, Metcalfe yelled at Koeger, and Koeger called Metcalfe an ass.  (Id., Ex. A.)  Koeger took the rare step of writing an incident report for the traffic stop because of its aggressive and hostile tone.  (Id. ¶ 4.)  In addition, he notified his sergeant about his safety concerns arising from the incident, later explaining he "believed Metcalfe to be dangerous to [his] safety and the safety of others due to [Metcalfe's] statement and [Metcalfe's] actions on this day."  (Id., Ex. B, at 1.)

---

[2] See also State v. Metcalfe, Crim. No. 73-10-5777, 2012 WL 4052509 (Minn. Ct. App. Sept. 17, 2012).

A few months later, on September 7, 2010, Koeger believed he saw Metcalfe's

vehicle in his neighborhood, which he took as "a serious threat to [his] safety and that of

[his] family members stemming from [his] official duties as an Officer." (Koeger Dep.

29; Koeger Aff., Ex. B, at 1.) The next day, Koeger put together a packet of information

about Metcalfe. (Koeger Dep. 33-34.) He carried the packet in his personal bag until fall

2012. (Id. 38-39.) He also learned about Metcalfe's arrest in Saint Cloud and called

Priebe. (Id. 36-37.) At Priebe's suggestion, he called Doe, who warned him Metcalfe

was dangerous and scary. (Koeger Aff., Ex. B, at 1.)

After July 2010, Koeger did not see or hear of Metcalfe committing any crime or

see him do anything warranting being stopped or detained by police. (Koeger Dep. 40-

41.) He did not speak to Metcalfe, and he saw Metcalfe or a vehicle registered to him

twice after July 2010. (Id. 41.) Koeger accessed Metcalfe's DVS information twenty-

four times between July 6, 2010, and March 22, 2012. (Id. Ex. 2.) He explained he ran

Metcalfe's information periodically to see if Metcalfe had taken care of the citation, to

check on his driving status, and to see if he had any warrants against him. (Nowicki

Decl., Ex. 2, at 21.)

A couple of months after Koeger last accessed Metcalfe's information, Priebe

accessed Metcalfe's DVS records in Saint Cloud. Priebe's brother had been dating Doe

since 2010 (and, consequently, Priebe knew Metcalfe's and Doe's son and saw him

"maybe once every other month"). (Preibe Dep. 6, 12-14.) On or near September 9,

2012, Priebe's brother told him that Metcalfe had threatened to come after his job and

have him fired. (Id. 16.) The first time Priebe was at work after learning of the threat, he

ran a DVS search on Metcalfe to access Metcalfe's full name, date of birth, and current

address, so that he could make a thorough report to his supervisor, Michael Koeniguer.

(Id. 16-18, 21, 40.)  Priebe then met with Koeniguer to notify him that Metcalfe was

likely to make accusations against him, so that Koeniguer could report the threat to

whomever else needed to know.  (Id. 17, 21.)  Priebe told him about issues with Metcalfe,

but Koeniguer did not follow up on the conversation because, in his view, Priebe had

done nothing wrong and there were no security threats at the time.  (Koeniguer Aff. ¶ 2.)

There was no department determination that Priebe's lookup of Metcalfe's information

was inappropriate.  (Priebe Dep. 21-22.)

On June 28, 2013, Metcalfe commenced the instant action, alleging Defendants

violated the DPPA.  With discovery complete, all Defendants now move for summary

judgment, arguing, *inter alia*, that the facts do not establish a violation of the DPPA;

Metcalfe cross-moves for summary judgment with respect to Koeger, Saint Paul, and

White.  The Motions have been fully briefed, the Court heard argument on September 11,

2014, and the Motions are now ripe for disposition.

**STANDARD OF DECISION**

Summary judgment is proper if, drawing all reasonable inferences in favor of the

nonmoving party, there is no genuine issue as to any material fact and the moving party is

entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett,

477 U.S. 317, 322–23 (1986).  The moving party bears the burden of showing that the

material facts in the case are undisputed.  Id. at 322; Whisenhunt v. Sw. Bell Tel., 573

F.3d 565, 568 (8th Cir. 2009).  The Court must view the evidence, and the inferences that

may be reasonably drawn from it, in the light most favorable to the nonmoving party.

Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009); Carraher v.

Target Corp., 503 F.3d 714, 716 (8th Cir. 2007).  The nonmoving party may not rest on

mere allegations or denials, but must show through the presentation of admissible

evidence that specific facts exist creating a genuine issue for trial.  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 256 (1986); Wingate v. Gage Cnty. Sch. Dist., No. 34, 528

F.3d 1074, 1078–79 (8th Cir. 2008).

Where, as here, the Court confronts cross-motions for summary judgment, this

approach is only slightly modified.  When considering Metcalfe's Motions, the Court

views the record in the light most favorable to Defendants, and when considering

Defendants' Motions, the Court views the record in the light most favorable to Metcalfe.

"Either way, summary judgment is proper if the record demonstrates that there is no

genuine issue as to any material fact."  Seaworth v. Messerli, Civ. No. 09-3437, 2010 WL

3613821, at *3 (D. Minn. Sept. 7, 2010) (Kyle, J.), aff'd, 414 F. App'x 882 (8th Cir.

2011) (per curiam).

## ANALYSIS

### 1. DPPA

Congress enacted the DPPA in 1994 to address concerns about improper access to

personal information stored in motor-vehicle records.  The statute prohibits the disclosure

of this information but carves out fourteen permissible uses, 18 U.S.C. § 2721, and it

provides for a civil claim against any individual who 1) discloses, obtains or uses data

2) from motor-vehicle records 3) for a purpose that is not permitted, § 2724(a).  Two of

the fourteen statutorily permitted purposes for obtaining information from motor-vehicle records are at issue in this case.  The first is use "by any government agency, including any court or law enforcement agency, in carrying out its functions" (the "law-enforcement exception").  § 2721(b)(1).  The second is use "in connection with any civil, criminal, administrative, or arbitral proceeding in any Federal, State, or local court or agency or before any self-regulatory body, including the service of process, investigation in anticipation of litigation, and the execution or enforcement of judgments and orders, or pursuant to an order of a Federal, State, or local court" (the "litigation exception").  § 2721(b)(4).  Defendants argue their actions fall under these permitted purposes.

   2.  *Priebe and Saint Cloud*

   The only contested access of Metcalfe's personal information with regard to Priebe (and Saint Cloud) occurred on September 9, 2012.  Priebe argues, among other things, that he obtained Metcalfe's information on that date for law-enforcement purposes, which Metcalfe disputes.

   The contours of the law-enforcement exception are not clearly defined, but the text, legislative history, and case law support interpreting it broadly.  The text of § 2721(b)(1) is open-ended, not limited by language explaining what counts as a law-enforcement function, suggesting it should be read broadly.  Kost v. Hunt, 983 F. Supp. 2d 1121, 1134 (D. Minn. 2013) (Ericksen, J.) (holding the law-enforcement exception "does not include specific examples suggestive of limited categories of activities covered by the provision").  Furthermore, courts generally agree the legislative history of the DPPA supports reading the exception broadly.  E.g., Roschen v. Wabasha Cnty., Civ. No.

7

13-2490, 2014 WL 3105032, at *5 (D. Minn. June 26, 2014) (Montgomery, J.) ("[T]he

legislative history recognizes law enforcement's legitimate need for information

contained in state records and the authority to use that information to effectuate the

purposes identified in the Act without fear of liability.") (internal quotation omitted);

Mitchell v. Aitkin Cnty., Civ. No. 13-2167, 2014 WL 835129, at *7-9 (D. Minn. Mar. 4,

2014) (Ericksen, J.); Smythe v. City of Onamia, Civ. No. 12–3149, 2013 WL 2443849, at

*5 (D. Minn. June 5, 2013) (Montgomery, J.) ("[T]he legislative history reflects a desire

to preserve broad discretion for law enforcement agents to retrieve information in the

course of their duties.") (internal citation omitted).

Courts have broadly interpreted the law-enforcement exception.  For example, in

Parus v. Kroeplin, 402 F. Supp. 2d 99 (W.D. Wis. 2005), the court held that a town

dispatcher acting for professional, rather than personal, reasons satisfied the law-

enforcement exception.  Although the dispatcher relayed protected information to a third

party who used the information for personal reasons, the dispatcher herself was not liable

because she shared the information not knowing it would be used for personal reasons.

Id. at 106-08.  Similarly, in Senne v. Village of Palatine, the court read the law-

enforcement exception to apply to every instance of writing information from motor

vehicle records onto publically-visible parking tickets, even though the information on

the ticket was only sometimes used for law-enforcement functions.  Civ. No. 10-5434,

2013 WL 6197092, at *8-9 (N.D. Ill. Nov. 27, 2013); see also Downing v. Globe Direct

LLC, 682 F.3d 18, 22-24 (1st Cir. 2012) (holding that a private third party that mailed

registration renewal notices, together with advertisements, to addresses obtained from

protected information fell under the exception because mailing out the renewal notices was "clearly a government function").

In this Court's view, the breadth of the law-enforcement exception sweeps within its ambit the challenged conduct here. The Court is persuaded that the law-enforcement exception reaches obtaining information necessary to report threats against police officers. Police departments have an interest in knowing about threats against their officers because threats can impair an officer's ability to effectively enforce the law. Here, Priebe obtained Metcalfe's information after he learned Metcalfe threatened to come after his job as a police officer and have him fired. (Priebe Dep. 16.) Having been threatened in his role as a police officer, he looked up Metcalfe's information so that his supervisor had all the necessary information about the threat. (Id. 16-18, 21.)

Metcalfe argues Priebe accessed the information for personal reasons, but the facts do not suggest any purpose other than reporting the threat. Metcalfe argues Priebe's relationship with Metcalfe's son gave him a personal interest to access Metcalfe's information. But Priebe testified that he only sees Metcalfe's son "maybe once every other month," and Metcalfe fails to provide any additional evidence of a relationship between the two. (Id. 14.) That Priebe and Metcalfe's son occasionally saw each other does not create a relationship sufficiently significant to genuinely question the facts pointing to a law-enforcement-function motivation. Metcalfe also argues that Priebe's knowledge of the threat gave him a personal interest in looking up Metcalfe's data. However, the fact that Priebe knew about the threat says nothing about Priebe's motivation being something other than a law-enforcement one. Metcalfe also suggests

that Priebe fabricated his law-enforcement-exception argument after the fact to defend his

lawsuit.  But this bald assertion is contradicted by the undisputed evidence that Priebe

reported the issue with Metcalfe on September 9, 2012.  (Koeniguer Aff. ¶ 2.)

For these reasons, Priebe is entitled to summary judgment on Metcalfe's claims.[3]

And because Metcalfe's claim against Saint Cloud was based on a theory of vicarious

liability, Priebe is also entitled to summary judgment on this claim.

### 3.  *Koeger and Saint Paul*

Koeger also argues he acted for law-enforcement reasons when he obtained

Metcalfe's information; the Court agrees.  Similar to Priebe's situation, the Court is

persuaded that the law-enforcement exception extends to actions officers take for their

safety.  Officer safety is integral to effective law enforcement, and officers need to

protect themselves from threats arising out of their duties.  The law-enforcement

exception also covers the basic duties of law enforcement such as following up on

encounters with citizens.

Koeger testified that he accessed Metcalfe's personal information out of concern

for his and his family's safety.  (Koeger Aff., Ex. B, at 1.)  He explained this concern was

based on the heated traffic stop and believing he saw Metcalfe in his neighborhood.  (Id.)

Koeger also accessed Metcalfe's information to check whether he had paid his ticket or

had outstanding warrants.  (Nowicki Decl., Ex. 2, at 21.)  In the Court's view, both

reasons fall within the law-enforcement exception.  Metcalfe argues that the extent of the

---

[3] The Court therefore need not address Preibe's arguments about the litigation exception and
qualified immunity.

lookups, the fact that Koeger kept Metcalfe's information in his personal duty bag, and the lack of contact between Koeger and Metcalfe after the traffic stop all show that Koeger acted for personal reasons.  (Koeger Dep., 38-40, Ex. 2.)  These circumstances, however, are equally consistent with an explanation of personal safety and record-keeping, and Metcalfe does not point to other facts in the record that materially dispute Koeger's testimony.

For these reasons, Koeger is entitled to summary judgment.  And as before, Saint Paul is therefore also entitled to summary judgment.

*4.  White*

Unlike Priebe and Koeger, White invokes the litigation exception.  The Supreme Court recently addressed the scope of this exception in Maracich v. Spears, holding that access to personal information by an attorney in an attempt to solicit clients fell outside the exception.  133 S. Ct. 2191 (2013).  The Court held the exception should be read narrowly to exclude solicitation, explaining that the litigation exception is meant to "ensure the integrity and efficiency of an existing or imminent legal proceeding."  Id. at 2202.  Seeking clients is a business activity, not a legal activity; the sorts of things that *do* fall under the litigation exception include investigating and preparing a lawsuit.  Id.  An "investigation in anticipation of litigation," for example, does not include client solicitation, but does include "background research to determine whether there is a supportable theory for a complaint, a theory sufficient to avoid sanctions for filing a frivolous lawsuit, or to locate witnesses for deposition or trial testimony."  Id.

The Court concludes that White's access of Metcalfe's personal information falls under the litigation exception. She testified that she looked up the information for the purpose of upcoming litigation. (White Dep. 23-24; Nowicki Decl., Ex. 1, at 15.) She knew her daughter, a regular visitor at her house, was frightened of Metcalfe. (White Dep. 17.) Her daughter reported threatening contacts to the police twice in early 2010, and there is no dispute she obtained a no-contact order against him after he stalked her on July 2, 2010. White recognized that the situation was "very serious" and was concerned for her and her family's safety. (Id. 24.) In addition, an attorney advised her of the dangers to her family. (Id. 23.) Metcalfe has not pointed to any facts materially disputing White's testimony that she accessed his records for litigation purposes. He argues that she never spoke to anyone about his records, suggesting she was not pursuing litigation. However, not sharing the information does not materially conflict with her testimony that she was preparing for litigation. Especially given the perception of an increasing threat Metcalfe posed to her and her family, White could keep his information to herself even as she gathered it in contemplation and preparation for an upcoming case.

For these reasons, summary judgment will be granted to White.

## CONCLUSION

Based on the foregoing reasons, and all the files, records, and proceedings herein,

**IT IS ORDERED**:

1. the Motion for Summary Judgment by Priebe and Saint Cloud (Doc. No. 20) is **GRANTED**;

2. the Motion for Summary Judgment by Koeger and Saint Paul (Doc. No. 43) is

   **GRANTED**, and Metcalfe's cross-Motion (Doc. No. 26) is **DENIED**;

3. the Motion for Summary Judgment by White (Doc. No. 22) is **GRANTED**,

   and Metcalfe's cross-Motion (Doc. No. 28) is **DENIED**; and

4. Metcalfe's Complaint (Doc. No. 1) is **DISMISSED WITH PREJUDICE**.


**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated: October 10, 2014                          s/Richard H. Kyle
                                                 RICHARD H. KYLE
                                                 United States District Judge